# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| JANIE SUE POPE,<br>    Plaintiff | )<br>)<br>) | |
| v. | ) | Civil Action No. 2:14cv00039 |
| | ) | |
| CAROLYN W. COLVIN,<br>  Acting Commissioner of<br>  Social Security,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>) | **MEMORANDUM OPINION**<br><br>By: Pamela Meade Sargent<br>United States Magistrate Judge |

## *I. Background and Standard of Review*

Plaintiff, Janie Sue Pope, ("Pope"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Pope protectively filed an application for DIB on January 17, 2011, alleging disability as of September 2, 2010, due to diabetes, mini strokes, vision problems, partial colon removal, possible periodontal gum disease, obesity, high cholesterol and hypertension. (Record, ("R."), at 186-87, 201, 204.) The claim was denied initially and on reconsideration. (R. at 102-104, 108-10, 113, 115-17, 119-21.) Pope then requested a hearing before an administrative law judge, ("ALJ"), (R. at 143.) A video hearing was held on May 14, 2013, at which Pope was represented by counsel. (R. at 37-75.)

By decision dated June 13, 2013, the ALJ denied Pope's claim. (R. at 22-32.) The ALJ found that Pope met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2014. (R. at 24.) The ALJ also found that Pope had not engaged in substantial gainful activity since September 2, 2010, her alleged onset date.[1] (R. at 24.) The ALJ found that the medical evidence established that Pope suffered from severe impairments, namely transient ischemic attacks, ("TIAs"); hypertension; diabetes mellitus with retinopathy; obesity;

---

[1] Therefore, Pope must show that she became disabled between September 2, 2010, the alleged onset date, and June 13, 2013, the date of the ALJ's decision, in order to be entitled to DIB benefits.

migraines; anemia; peripheral arterial disease; gastritis; and duodenitis,[2] but she found that Pope did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 24-25.) The ALJ found that Pope had the residual functional capacity to perform light work[3] that did not require more than occasional climbing of ramps and stairs, that allowed for only frequent balancing, bending, stooping, kneeling, crouching and crawling and that did not require her to climb ladders, ropes or scaffolds and that did not require concentrated exposure to unprotected heights and dangerous equipment. (R. at 26.) The ALJ also found that Pope was limited to frequent visual far acuity. (R. at 26.) The ALJ found that Pope was able to perform her past relevant work as a coal distribution coordinator. (R. at 30.) In addition, based on Pope's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that other jobs existed in significant numbers in the national economy that Pope could perform, including jobs as an office helper, a mail routing clerk and a file clerk. (R. at 31-32.) Thus, the ALJ found that Pope was not under a disability as defined by the Act, and was not eligible for DIB benefits. (R. at 32.) *See* 20 C.F.R. § 404.1520(f), (g) (2015).

After the ALJ issued her decision, Pope pursued her administrative appeals, (R. at 16), but the Appeals Council denied her request for review. (R. at 3-7.) Pope then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[2] The ALJ found that one of Pope's impairments was "duodenibes." This appears to be a typographical error.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2015).

stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2015). The case is before this court on Pope's motion for summary judgment filed May 5, 2015, and the Commissioner's motion for summary judgment filed May 29, 2015.

*II. Facts*

Pope was born in 1955, (R. at 186), which classifies her as a "person of advanced age" under 20 C.F.R. § 404.1563(e). She has a high school education and past relevant work as a coal distribution coordinator. (R. at 62, 205.) Pope stated that she watched her favorite television show and that she was able to remember what happened on the show. (R. at 60-61.) She stated that her job as a coal distribution coordinator involved weighing coal, weighing coal trucks and doing paperwork. (R. at 62.) Pope stated that she could not return to her job as a coal distribution coordinator because of her memory problems. (R. at 65.)

Vocational expert, Gerald Wells, also testified at Pope's hearing. (R. at 66-73.) Wells classified Pope's work as light, but sedentary[4] as performed because she sat most of the day, and skilled. (R. at 66.) Wells was asked to consider a hypothetical individual of Pope's age, education and work experience, who would be limited to light work that did not require more than occasional climbing of stairs and ramps, that did not require more than frequent balancing, stooping, kneeling, crouching and crawling, that did not require her to climb ladders, scaffolds and ropes, that did not require concentrated exposure to unprotected heights and

---

[4] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2015).

dangerous equipment and that allowed frequent visual far acuity. (R. at 67-68.) Wells stated that such an individual could perform Pope's past relevant work, as classified in the Dictionary of Occupational Titles, ("DOT"). (R. at 68.) Wells also stated that there would be other jobs available at the light exertional level that existed in significant numbers that such an individual could perform, including jobs as an office helper, a mail routing clerk and a file clerk. (R. at 68-69.)

Wells stated that there would be no jobs available if the individual would be absent more than one day a month and if the individual had to rest two hours a day, meaning that the person would be off-task 25 percent of the workday. (R. at 70.) Wells was asked to consider the same individual, but who would have occasional limitations in near and far visual acuity and would need the use of a magnifying glass. (R. at 72.) He stated that the individual could not perform Pope's past work or any job. (R. at 72.) Wells was then asked to assume the first hypothetical individual, but who would need frequent supervision in order to maintain persistence and pace. (R. at 72-73.) He stated that this would be a special accommodation that would not be provided in a normal competitive environment. (R. at 73.) He also stated that it was difficult to sustain work when the individual would be off-task more than 15 percent of the workday. (R. at 73.)

In rendering her decision, the ALJ reviewed medical records from Joseph Leizer, Ph.D., a state agency psychologist; Dr. Donald Williams, M.D., a state agency physician; Dr. Douglas J. Springer, M.D.; Wellmont Lonesome Pine Hospital; Dr. Lawrence Ray Morris, M.D.; Appalachian Physical Therapy and Sports Clinic; Dr. Michael Ford, M.D.; Dr. Howard L. Cummings, M.D.; Dr. R. David Sheppard, D.O.; Dr. Otakar Kreal, M.D.; and Dr. John L. Chapman, M.D.

On August 26, 2010, Pope was admitted to Wellmont Lonesome Pine Hospital where Dr. Michael Ford, M.D., and Dr. Marissa Vitocruz, M.D., assessed her with an altered mental status possibly due to TIA, uncontrolled type II diabetes, dehydration, hypertension and diarrhea. (R. at 286-301.) On examination, although Pope had reduced left leg strength, she had an otherwise unremarkable examination, including full right leg strength, orientation to person, place and time and good short- and long-term memory. (R. at 287.) A CT scan of Pope's head showed no acute intracranial bleed or lesions, and periventricular and subcortical hypodensities were noted in the right frontal region and in the basal ganglia of the right side, probably secondary to chronic small vessel ischemia. (R. at 295-96.) A Doppler study of Pope's vertebral and carotid arteries of the neck did not show evidence of hemodynamically significant obstructive lesions. (R. at 297-98.) An echocardiogram was normal. (R. at 299-301.) An MRI of Pope's brain showed areas of restricted diffusion in the periventricular and deep white matter on both sides, suggestive of acute and subacute ischemia and a couple of small old lacunar infarcts in the basal ganglia region, one on each side. (R. at 302-04.) Pope was diagnosed with arteriosclerotic vascular disease; mini strokes (TIAs); hypertension; type II diabetes; plaques in central nervous system; renal insufficiency, improved with hydration; menopausal syndrome; history of hypothyroidism; post gallbladder surgery; hyperlipidemia; allergies; history of MRSA, recurrent; and significant anemia. (R. at 289.)

On September 20, 2010, Dr. Otakar Kreal, M.D., a neurologist, diagnosed Pope with vasculopathy, poorly controlled diabetes and hypertension and neurological symptoms consistent with a stroke. (R. at 479.) Pope reported symptoms of unintelligible speech, imbalance, leaning and falling if not held,

which resulted in her hospitalization in August 2010. (R. at 480.) While her symptoms improved in the hospital, she still had some difficulty getting words out, some imbalance and decreased memory. (R. at 480.) On examination, Dr. Kreal noted that Pope had some aphasia with difficulty naming complex objects, slow and mildly reactive pupils, mild bicep weakness and unstable gait, but she was pleasant, had appropriate behavior, clear speech and normal sensation and coordination. (R. at 481.) Pope's cornea appeared "dirty looking (scratched-like)" on the left. (R. at 481.) Her visual fields were normal. (R. at 481.) Pope's optic disc was normal on the right, and she was unable to see on the left. (R. at 481.) Dr. Kreal noted that Pope's optic disc seemed to be drifting to the left. (R. at 481.) Her retinas were clear without evidence of edema. (R. at 481.)

On October 21, 2010, Dr. Kreal noted that Pope was nearly normal with no evidence of speech problems or imbalance. (R. at 475.) Pope's memory was near normal. (R. at 476.) Dr. Kreal noted that Pope had done well on her medications. (R. at 475.) On October 18, 2012, Dr. Kreal noted that Pope had not had a recurrence of stroke since August 2010, and that she did well on her prescribed medications. (R. at 471-73.) Although Pope reported issues with her memory, she stated that she had not given up any activities because of her memory. (R. at 471-72.) Dr. Kreal opined that Pope's mood could be contributing to her deficits, which could potentially be the only cause. (R. at 471.) On examination, Pope had difficulty with visuospatial/executive skills; difficulty coming up with words; and decreased foot vibration sensation. (R. at 473.) Pope was attentive with normal concentration. (R. at 473.) Her examination was otherwise unremarkable, revealing normal mood and behavior; alertness; orientation to person, place and time; normal speech and language; attentiveness; normal concentration, recall and cognition;

facial strength; sensation; extremity strength; coordination; and gait. (R. at 473.)

On October 19, 2010, Pope saw Dr. Lawrence Ray Morris, M.D., an endocrinologist, for evaluation of her diabetes mellitus. (R. at 337-38.) Dr. Morris noted that Pope had a metabolic syndrome, an insulin resistance syndrome, associated with obesity with manifestations of type II diabetes mellitus, hypertension and dyslipidemia. (R. at 337.) Dr. Morris opined that Pope needed to lose weight and engage in regular physical activity in order to increase her sensitivity to insulin to enhance effectiveness of her then-current medications. (R. at 337.) On January 25, 2011, and May 25, 2011, Pope reported that she was not following a meal plan or diet for diabetes. (R. at 324, 334.) While Pope reported blurred vision, she denied foot numbness and tingling, tiredness, weakness or mood changes. (R. at 324, 334.) Dr. Morris emphasized the importance of exercise and portion control. (R. at 324.) Dr. Morris opined that Pope's diabetes was poorly controlled. (R. at 324, 334.)

On October 25, 2010, Pope saw Dr. Douglas J. Springer, M.D., for evaluation of anemia. (R. at 277-79.) Physical examination was unremarkable. (R. at 278-79.) Dr. Springer diagnosed anemia and positive hemoccult. (R. at 279.) On November 4, 2010, Dr. Springer performed a colonoscopy and endoscopy and further diagnosed mild antral gastritis; colon mass and polyps incompletely removed; internal hemorrhoids; and markedly redundant left colon. (R. at 280-81.) Dr. Springer recommended a right colectomy. (R. at 281.)

From October 19, 2010, Dr. John L. Chapman, M.D., examined Pope for complaints of being unable to read a newspaper and difficulty reading road signs.

(R. at 318.) On January 17, 2011, Pope denied visual acuity symptoms since laser treatment. (R. at 315.) She also denied floaters and flashes. (R. at 315.) On March 9, 2011, Pope reported that her visual acuity was doing "ok," that she was able to watch television without glasses and that she could read a newspaper. (R. at 314.) She denied floaters and flashes. (R. at 314.) During this time, Dr. Chapman diagnosed background diabetic retinopathy, diabetes, cataracts, suspected glaucoma and macular edema. (R. at 314-18.)

On January 10, 2011, Dr. Ford provided a doctor's note stating that Pope had multiple medical problems, including severe loss of vision; she was applying for total and permanent disability; and Dr. Ford supported her claim. (R. at 285.) However, upon examination that same day, Dr. Ford noted that Pope had an unremarkable examination, revealing no acute distress, no atrophy or weakness, intact joints and normal orientation and mood, symmetric deep tendon reflexes and normal gait. (R. at 371.)

On April 14, 2011, through March 14, 2013, Pope was treated by Dr. Howard L. Cummings, M.D., at Southeastern Retina Associates, for diabetic macular edema, ("CSME"), and non-proliferative diabetic retinopathy, ("NPDR"). (R. at 397-405, 450-64.) Dr. Cummings performed a number of eye injections. (R. at 398-99, 402, 453, 455, 458, 460, 462.) During this time, Pope reported that her vision acuity had improved, allowing her to see the television better, and she had no floaters, flashes or pain. (R. at 450-51, 454, 456-57, 459, 461, 463-64.) On March 14, 2013, Pope reported that her vision continued to improve. (R. at 465.) Dr. Cummings noted that Pope's acuity was 20/40 in the right eye and 20/60 in the left eye, with pinhole correction. (R. at 465.) She had background diabetic

retinopathy and moderate cataracts in both eyes. (R. at 465.) Dr. Cummings opined that Pope was doing well from a retinal standpoint with resolving diabetic macular edema. (R. at 465.)

On October 27, 2011, Mari Knettle, P.T., a physical therapist at Appalachian Physical Therapy and Sports Clinic, conducted an upper extremity-specific functional capacity evaluation to determine Pope's strength, position tolerance, mobility and materials handling ability. (R. at 407-13.) Pope participated fully in 11 out of 15 tasks and demonstrated self-limiting participation by stopping on four out of 15 tasks. (R. at 409.) Pope reported self-limiting participation due to fatigue and low back pain. (R. at 409.) Knettle opined that Pope was incapable of returning to her pre-injury job. (R. at 412.) She also found that Pope was incapable of performing sedentary work on a full-time basis due to requiring frequent rest periods to complete work simulation activities during the functional capacity evaluation. (R. at 412.) Knettle noted that Pope's generalized deconditioning could be improved upon through work conditioning activities; however, she found that it was unlikely that Pope could complete most sedentary jobs, even if she was better conditioned, because of her visual and coordination deficits. (R. at 412.)

On September 9, 2011, Dr. R. David Sheppard, D.O., saw Pope for diabetes and diabetic retinopathy. (R. at 414-15.) Pope denied fatigue, night sweats, weight changes and memory loss. (R. at 414-15.) Examination was unremarkable, revealing no distress, alertness, orientation and normal gait and station. (R. at 415.) On October 11, 2011, Pope's hemoglobin was elevated at 7.6, but her physical examination was unremarkable. (R. at 417.) On January 11, 2012, Pope's hemoglobin had improved since her last visit. (R. at 419.) Examination was

unremarkable, revealing no distress and normal gait and station. (R. at 419.) On August 2, 2012, Dr. Sheppard noted that Pope's diabetes was controlled, she underwent lithotripsy for a large kidney stone since her last visit, and she had no complaints. (R. at 422.) Examination was unremarkable, revealing pleasantness, no distress, and normal gait and station. (R. at 422.) On November 12, 2012, Dr. Sheppard noted that Pope had no symptoms while on prescribed medications and that her symptoms were controlled with medications. (R. at 428.) Examination was unremarkable, revealing alertness, orientation and normal speech, sensation, strength and reflexes. (R. at 429.)

On March 4, 2013, Pope reported that the previous week, she had difficulty speaking and that her symptoms lasted 30 to 40 minutes. (R. at 431.) Her physical examination was unremarkable. (R. at 431-32.) A CT scan of Pope's head performed on March 12, 2013, showed no acute intracranial findings. (R. at 447.) An ultrasound and color Doppler study of Pope's vertebral and carotid arteries of the neck showed anterograde flow in both vertebral arteries; no evidence to suggest significant obstruction of the common or internal carotid arteries on either side; and mild calcific atherosclerotic disease producing less than 50 percent diameter narrowing of the carotid bulbs in both sides. (R. at 448-49.)

On September 27, 2011, Dr. Donald Williams, M.D., a state agency physician, completed a medical assessment, indicating that Pope had the residual functional capacity to perform light work. (R. at 92-95.) Dr. Williams opined that Pope could occasionally climb ramps and stairs; frequently balance, stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds. (R. at 93.) He opined that Pope had limited far acuity in both eyes and that the functioning was

limited to frequent. (R. at 93-94.) No manipulative or communicative limitations were noted. (R. at 93-94.) Dr. Williams also opined that Pope could not work around concentrated exposure to hazards, including machinery and heights. (R. at 94.)

On September 29, 2011, Joseph Leizer, Ph.D., a state agency psychologist, found that Pope did not have a mental diagnosis and was not receiving outpatient mental health treatment. (R. at 91.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2015); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2015).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether

substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Pope argues that the ALJ erred by improperly determining her residual functional capacity. (Plaintiff's Memorandum In Support Of Her Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Pope further argues that the ALJ erred by failing to give specific reasons for discrediting her testimony. (R. at 7.)

The ALJ found that Pope had the residual functional capacity to perform light work that did not require more than occasional climbing of ramps and stairs, that allowed for only frequent balancing, bending, stooping, kneeling, crouching and crawling and that did not require her to climb ladders, ropes or scaffolds and that did not require concentrated exposure to unprotected heights and dangerous equipment. (R. at 26.) The ALJ also found that Pope was limited to frequent visual far acuity. (R. at 26.) Based on my review of the record, I find that substantial evidence exists to support these findings.

The record shows that Pope had essentially unremarkable physical examinations, revealing normal speech; language; orientation; attentiveness; concentration; memory; extremity strength; sensation; coordination; reflexes; and gait. (R. at 278-79, 287, 371, 415, 417, 419, 422, 429, 431-32, 473, 477.) Pope reported that her energy level and memory were normal. (R. at 277, 324, 334, 415.)

In October 2010, Dr. Kreal found that Pope was nearly normal with no evidence of speech problems or imbalance and that her memory was near normal. (R. at 476.) In January 2011, Pope denied visual acuity symptoms since undergoing laser treatment. (R. at 315.) She also denied floaters and flashers. (R. at 315.) While Dr. Ford stated in January 2011 that he supported Pope's claims for total and permanent disability due to multiple medical problems, his examination that same day was unremarkable. (R. at 285, 371.) In March 2011, Pope reported that her visual acuity was doing "ok," that she was able to watch television without glasses and could read a newspaper. (R. at 314.) Pope was treated by Dr. Cummings from April 2011 through March 2013. (R. at 397-405, 450-64.) During this time, Pope reported that her vision acuity had improved, allowing her to see the television better, and she had no floaters, flashes or pain. (R. at 450-51, 454, 456-57, 459, 461, 463-64.)

On March 14, 2013, Pope reported that her vision continued to improve. (R. at 465.) Dr. Cummings opined that Pope was doing well from a retinal standpoint with resolving diabetic macular edema. (R. at 465.) In August 2012, Dr. Sheppard noted that Pope's diabetes was controlled, and she had an unremarkable examination. (R. at 422.) In October 2012, Pope reported issues with her memory, but stated that she had not given up any activities due to her memory problems. (R. at 471-72.) In November 2012, Dr. Sheppard noted that Pope had no symptoms while on prescribed medications and that her symptoms were controlled with medications. (R. at 428.) In addition, Dr. Kreal noted that Pope was doing well on her prescribed medications. (R. at 471-73, 475.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785

F.2d 1163, 1166 (4th Cir. 1986). Furthermore, there is no indication that any of Pope's treating physicians placed any limitations on her work-related abilities.

I further find that the ALJ properly considered Pope's subjective complaints and that substantial evidence supports her finding that they were not fully credible. Despite Pope's many subjective complaints, the record shows that she told her doctors that she had not given up any of her activities because of her impairments, (R. at 471-72), and that her vision had improved with treatment to the point that she could watch television without glasses and read a newspaper. (R. at 314.)

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the medical evidence, the ALJ's finding with regard to Pope's residual functional capacity and her finding that Pope was not disabled. An appropriate Order and Judgment will be entered.

ENTERED: March 18, 2016.

                                              s/ *Pamela Meade Sargent*
                                              UNITED STATES MAGISTRATE JUDGE